**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| YANIV KASLASI,<br>Petitioner,<br>vs.<br>SHELI ABERGIL,<br>Respondent. | Case No.: 2:25-cv-01227-GMN-MDC<br>**ORDER REJECTING R&R AND DENYING PETITION** |

Pending before the Court is the Report and Recommendation ("R&R") by Magistrate Judge Couvillier, (ECF No. 59), recommending that Petitioner Yaniv Kaslasi's Petition, (ECF No. 1), be granted and Petitioner's request for fees and costs be granted. Respondent filed an Objection, (ECF No. 68), and Petitioner filed a Response, (ECF No. 74). Because the Court finds that the United States was O.Y.K.'s habitual residence on the date of retention, the Court **REJECTS** Magistrate Judge Couvillier's R&R and **GRANTS** the Petition.

## I. <u>BACKGROUND</u>

This case concerns a petition to return a five-year old child to Israel under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 19 I.L.M. 1501, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, governed by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*. (formerly codified at 42 U.S.C. § 11601 *et seq*.). The child involved here is O.Y.K., who currently resides in the United States with Respondent, his mother. Petitioner is O.Y.K.'s father.

Petitioner and Respondent are Israeli citizens who have lived their entire lives in Israel prior to traveling to Las Vegas in December 2024. (Day 1 Tr. 120:5–11, ECF No. 46). Petitioner and Respondent became friends in 2017, and when the parties discovered that Respondent was pregnant in 2020, they married. (Joint Pretrial Order ("JPTO") 3:12–13). On

June 13, 2020, O.Y.K. was born in Jerusalem. (*Id.* 3:14). Petitioner and Respondent both have extended family in Israel, including their parents, aunts, uncles, and cousins. (Day 1 Tr. 14:5–15:12). When O.Y.K. lived in Israel, he had a relationship with this family and saw them on a regular basis. (*Id.*). O.Y.K. was enrolled in preschool in Israel, and he received disability benefits. (*Id.* 12:21–14:4). Respondent alleges that, throughout their marriage, there have been a number of incidents of Petitioner seriously physically and emotionally abusing her, including several occasions on which she called the police on him while in Israel. (Day 2 Tr. 131:24–140:19, ECF No. 45).

Petitioner, Respondent, and O.Y.K. travelled from Jerusalem to Las Vegas, arriving on December 6, 2024. (JPTO 3:17–18). They came to the United States on tourist visas that allowed a maximum stay of six months. (*Id.*). Before their December 6 flight, the parties allowed their apartment lease in Israel to expire and neither renewed it nor leased another apartment. (Day 3 Tr. 24:10–12, ECF No. 52). At least some of the parties' furniture and appliances were listed for sale and were either sold or given away prior to their move. (Facebook Marketplace Messages, Resp't's Ex. A); (Day 2 Tr. 109:3–5; 124:1–2). Both of the parties' cars in Israel were sold prior to their move, as was their pet dog. (Day 1 Tr. 72:1–8); (Day 3 Tr. 33:18–34:20); (Day 2 Tr. 109:3–5; 146:12–23; 159:8–12); (Skoda Fabia Sale Proceeds, Resp't's Ex. CC); (Day 2 Tr. 146:12–23). The parties withdrew O.Y.K. from school in Israel, and Respondent testified that he had a going-away party for his class. (Day 1 Tr. 155:21–23).

When they arrived in Las Vegas, the parties signed a five-month lease on a house, (Lease, Resp't's Ex. R), paid the full five months' rent in advance, (Receipt, Resp't's Ex. S); and furnished the house, (Day 2 Tr. 61:4–16; 124:14–25:5). They promptly purchased a car and insured it. (Title, Resp't's Ex. F); (Day 1 Tr. 45:15–46:11); (Temp. Placard, Pet'r's Ex. 34 (displaying issue date of December 9, 2024)); (Day 2 Tr. 148:8–14). Both parties obtained

Nevada Instruction Permit Driver Authorization Cards and took their driver's license tests. (Pet'r's Driver's Permit, Resp't's Ex. H); (Resp't's Driver's Permit, Resp't's Ex. GG); (Day 3. Tr. 34:21–35:12). They also enrolled O.Y.K. in school soon after arriving, and they were offered a tuition grant for the 2024-2025 school year. (Certificate, Resp't's Ex. B); (Day 2 Tr 64:14–66:5; 148:21–25).

Sometime after the parties arrived in the United States, Respondent hid O.Y.K.'s passport, which led to a disagreement between the parties on January 31, 2025. (Day 1 Tr. 48:14–19; 71:22–74:21). The disagreement resulted in an alleged domestic violence incident and Petitioner's arrest. (Police Report, Resp't's Ex. J). The next day, Petitioner was charged in Las Vegas Municipal Court with Battery/Domestic Violence. (Criminal Compl., Resp't's Ex. OO). Respondent also sought and obtained an *ex parte* Temporary Protective Order against Petitioner. (Temporary Protective Order, Resp't's Ex. K-1). On February 7, 2025, Respondent was granted an Extended Protection Order Against Domestic Violence. (Extended Protection Order, Resp't's Ex. K-2). The Extended Order prohibited Petitioner from threatening, physically injuring or harassing Respondent, and ordered him to contact Respondent for parenting issues only via Talking Parents App. (*Id.*).

On February 12, 2025, Petitioner left the country without informing Respondent. (JPTO 3:19); (Day 1 Tr. 87:15–16). Petitioner filed a child abduction complaint with the Israeli police shortly after arriving in Israel. (Certificate Criminal Compl., Pet'r's Ex. 8). He retained counsel and ultimately initiated this action on July 8, 2025. (Compl., ECF No. 1).

Magistrate Judge Couvillier held three evidentiary hearings on January 23, 2026, February 2, 2026, and February 17, 2026. (Mins., ECF Nos. 39, 42, 47). Both Petitioner and Respondent called multiple witnesses and admitted many exhibits into evidence. (*See id.*). The parties also submitted post evidentiary hearing briefs, (ECF Nos. 56, 57). Magistrate Judge Couvillier then entered his R&R which recommends granting the Petition, (ECF No. 1), and

granting Petitioner's requests for attorneys' fees and costs. (*See generally* R&R, ECF No. 59). Respondent timely filed an Objection, (ECF No. 68), which the Court considers below.

## II. LEGAL STANDARD

A party may file specific written objections to the findings and recommendations of a United States Magistrate Judge made pursuant to Local Rule IB 1-4. 28 U.S.C. § 636(b)(1)(B); D. Nev. R. IB 3-2. Upon the filing of such objections, the Court must make a *de novo* determination of those portions to which objections are made. *Id.* The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); D. Nev. R. IB 3-2(b).

## III. DISCUSSION

"Under the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention or Convention), Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99–11 (Treaty Doc.), a child wrongfully removed from her country of 'habitual residence' ordinarily must be returned to that country." *Monasky v. Taglieri*, 589 U.S. 68, 70–71 (2020). "The Convention defines a 'wrongful' removal or retention as one that breaches existing custody rights 'under the law of the State in which the child was habitually resident immediately before the removal or retention' if those rights 'were actually exercised' or 'would have been so exercised but for the removal or retention.'" *Golan v. Saada*, 596 U.S. 666, 670 n.1 (2022) (quoting the Convention).

The United States has implemented the Hague Convention by enactment of ICARA, 42 U.S.C. §§ 11601–11611. Under ICARA, state and federal district courts have concurrent jurisdiction over claims arising under the Convention. 42 U.S.C. § 11603(a). Furthermore, ICARA vests these courts with the authority to order the return of wrongfully removed or retained children. *See* 42 U.S.C. § 11603.

At bottom, the Hague Convention and ICARA seek to return children to their country of habitual residence for the resolution of any custody dispute, and to avoid international forum shopping. *See Asvesta v. Petroutsas*, 580 F.3d 1000, 1003–04 (9th Cir. 2009); *Valenzuela v. Michel*, 736 F.3d 1173, 1176 (9th Cir. 2013) ("The central purpose of the Convention is to prevent forum shopping in custody battles."); *Hague Convention*, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue").

To establish a prima facie case for the return of the children, the petitioner must show by a preponderance of the evidence that: (1) the child at issue is under the age of 16; (2) the child was removed or retained from their habitual residence in a foreign country that is a signatory to the Convention; (3) the petitioner had rights of custody at the time of the child's retention or removal; and (4) the petitioner was exercising those rights or would have exercised them, but for the removal or retention of the child. *Gomez v. Gonzales*, 771 F. Supp. 3d 1150, 1157 (W.D. Wash. 2025) (citing 22 U.S.C § 9003 and Convention, art. 4).

> A court [determining whether a child was wrongfully removed must] answer a series of four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001), *abrogated on other grounds by Monasky v. Taglieri*, 589 U.S. 68 (2020).

Respondent raises objections to the following findings made in the R&R: (1) Israel was O.Y.K.'s habitual residence at the time of the retention; (2) Respondent wrongfully retained O.Y.K. on February 12, 2025, in violation of Petitioner's custody rights; (3) Respondent did not establish the grave risk defense; and (4) Petitioner's request for fees and costs should be granted. The Court begins by determining when the alleged wrongful retention took place.

**A. Date of Retention**

Before reaching the question of which country was O.Y.K.'s habitual residence at the time of retention, the Court must first determine the date of retention because "the text of the Convention directs courts to only one point in time in determining habitual residence: the point in time 'immediately before the removal or retention.'" *Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) (quoting *Hague Convention*, art. 3). The parties disagree on this date: Petitioner asserts that the date of retention was only two days after the family arrived in the United States in December 2024, (Pet'r's Post Trial Br. 6:22–7:6, ECF No. 56), while Respondent's post-trial brief does not identify a date of retention, (*see generally* Resp't's Post Trial Br., ECF No. 57). Magistrate Judge Couvillier concluded, without explanation, that Respondent retained O.Y.K. on February 12, 2025. (R&R 5:21). Given the lack of reasoning provided in the R&R, and the key role the date of retention finding plays in the habitual residence determination, the Court considers the date of retention *de novo*. 28 U.S.C. § 636(b)(1); D. Nev. R. IB 3-2(b) ("The district judge may accept, reject or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge.").

The Convention's explanatory report notes that

> The fixing of the decisive date in cases of wrongful retention should be understood as that on which the child ought to have been returned to its custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence.

Elisa Pérez-Vera, Explanatory Report: Hague Conference on Private International Law, in 3 Acts and Documents of the Fourteenth Session 426 (1980), ¶ 108 [hereinafter Pérez-Vera Report]. Because the date of wrongful retention is part of the prima facie case, Petitioner bears the burden of proving this date by a preponderance of the evidence. 22 U.S.C. § 9003. There is little guidance from the Ninth Circuit on how courts should determine the date of retention. Many courts have followed the Third Circuit's definition of the date of retention, "the date

beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof." *Blackledge v. Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017); *see also Marks on behalf of SM, AM, and BM v. Hochhauser*, 876 F.3d 416, 422 (2d Cir. 2017) (identifying date of wrongful retention as that "on which the child ought to have been returned to its custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence" (internal quotation marks and citation omitted)).

Here, it is undisputed that the parties jointly agreed to bring O.Y.K. to the United States for at least until their return flights in February. The Ninth Circuit considered a similar situation in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001). There, the mother and father had agreed that the children would remain in the United States for fifteen months, but "disagree[d] as to what understanding existed beyond that." *See id.* at 1069. After a year in the United States, the mother sought dissolution of the marriage and custody of the children in California state court. *See id.* The Ninth Circuit identified the date of wrongful retention as "the moment . . . when [the mother] asked the Los Angeles County Superior Court to grant her custody of [the children]." *Id.* at 1070.

The facts of this case are similar: the parents agreed to bring O.Y.K. to the United States for at least a few months (at a minimum, until their return flights in February 2025), but they disagree as to what understanding existed beyond that time. Petitioner argues that the date of retention is December 8, the date he says Respondent hid O.Y.K.'s passport in her cousin's safe. (Day 1 Tr. 48:16–19). But, under the test articulated in *Blackledge*, Respondent's act of placing the passports in the safe is not decisive. 866 F.3d at 179. Rather, the central issue is when Petitioner made it clear to Respondent that he no longer consented to O.Y.K. being in the United States with Respondent. Respondent testified that Petitioner asked for O.Y.K.'s

passport in January of 2025, and she refused to give it to him. (Day 1 Tr. 132:9–11). Petitioner likewise testified that he asked her to give him O.Y.K.'s passport "[o]ver 20 times," and she never gave it back to him. (*Id.* 49:7–11). But Petitioner has provided no evidence that, by asking for O.Y.K.'s passport, he was clearly revoking his consent to O.Y.K. being in the United States—indeed, though both Petitioner and Respondent testified that Respondent refused to give O.Y.K.'s passport to Petitioner on multiple occasions, Petitioner did not testify that he told Respondent he actually intended to buy earlier return tickets for himself and O.Y.K. if he was given the passport. Petitioner asking for the passport so he *could* return to Israel with O.Y.K. at an unidentified future point is not an unequivocal indication that Petitioner no longer consented to O.Y.K. being in the United States with Respondent. *See Blackledge*, 866 F.3d at 179 (explaining that a retention date was on the date when "the noncustodial parent took the affirmative step of purchasing a ticket, asserted that any retention beyond the scheduled return date would constitute 'kidnapping,' and did not equivocate as to that retention date," and finding that retention date was not on date where the petitioner "only researched the possibility of purchasing a ticket . . . and Petitioner left open the possibility of further negotiations . . ."). Without evidence that Petitioner "clearly and unequivocally communicated" a revocation of his consent to O.Y.K. being in the United States, Petitioner has failed to meet his burden of establishing a date of retention in January of 2025.

The next possible date of retention is the date Petitioner left the United States and returned to Israel without Respondent and O.Y.K.: February 11, 2025. Importantly, both parties testified that Petitioner did not inform Respondent that he left the country. (Day 1 Tr. 87:15–16). Thus, Petitioner did not "clearly and unequivocally communicate[]" to Respondent that he no longer consented to O.Y.K.'s presence in the United States with Respondent at that time. Next, is February 20, 2025, the date of O.Y.K.'s return ticket to Israel, which Petitioner argues was the original date the family was supposed to return from their vacation. But, as

discussed more fully below, the Court concludes that the parties intended a permanent move to the United States, so the date of the original return ticket does not establish the end date of Petitioner's consent to O.Y.K. remaining in the United States.

On March 4, 2025, shortly after he arrived in Israel, Petitioner filed a motion for return of abducted child in the Jerusalem Family Matters Court. (Certificate Criminal Compl., Pet'r's Ex. 8 at PET000016). Several courts in cases with similar factual situations, including the Ninth Circuit in *Mozes*, have fixed the date of retention on the date a parent filed an action in court relating to the child. 239 F.3d at 1070 (setting the date of retention on the date the respondent "asked the Los Angeles County Superior Court to grant her custody of them."); *Abou-Haidar v. Sanin Vazquez*, 419 F. Supp. 3d 1, 11 (D.D.C.), *aff'd*, 945 F.3d 1208 (D.C. Cir. 2019) (finding the latest date of retention was the date the petitioner filed a counterclaim in response to the respondents Complaint for Custody filed in the United States). But here, nothing in the record indicates the Respondent was served in that case or was otherwise aware of its filing. Respondent's testimony that she was not aware Petitioner had returned to Israel for "a few months" instead supports a finding that she was not informed of the case filed in Israel. (Day 1 Tr. 32:2–4). Without evidence that Respondent was made aware of the case, Petitioner has not met his burden of showing that his withdrawal of consent was communicated to Respondent on this date. Thus, the Court cannot conclude that the date Petitioner filed the motion in Israel is the date of retention. *See Blackledge*, 866 F.3d at 179; *see also Abou-Haidar v. Sanin Vazquez*, 945 F.3d 1208, 1217 (D.C. Cir. 2019) (affirming the district court's selection of a date of retention when "both parents understood they disputed the exercise of custody over the child"); *Slagenweit v. Slagenweit*, 841 F. Supp. 264, 270 (N.D. Iowa 1993) ("The wrongful retention does not begin until the noncustodial parent . . . clearly communicates her desire to regain custody and asserts her parental right to have [the child] live with her.").

Without any evidence regarding the interim period, the final possible date of retention would be the date Respondent was served in this case. Petitioner has not identified a date prior when he made it known to Respondent that he no longer consented for O.Y.K. to be in the United States. Petitioner has therefore failed to meet his burden of showing a date of retention earlier than the initiation of this case. Thus, based on the record before it, the Court concludes that the date of retention was July 25, 2025, the date Respondent was served with the Complaint and Motion for Temporary Restraining Order in this case. (*See* Summons Returned Executed, ECF No. 12); *See Blackledge*, 866 F.3d at 179 ("[I]n the absence of any earlier communication in which Petitioner clearly and unequivocally withdrew his prior consent and sought to reassert his custody rights, we hold that consent expired and [the child] was therefore 'retained' on the date Petitioner filed his Hague Convention petition.").

**B. O.Y.K.'s Habitual Residence**

Having determined the date of retention, the Court now turns to the second question courts must answer in unlawful retention cases: "Immediately prior to the removal or retention, in which state was the child habitually resident?" *Mozes*, 239 F.3d at 1070. Magistrate Judge Couvillier determined that, on February 12, 2025, O.Y.K.'s habitual residence was Israel. (R&R 6:12-13). Respondent objected to Magistrate Judge Couvillier's determination that Israel was O.Y.K.'s habitual residence at the time of retention, (Obj. 3:19–28, ECF No. 68); the Court therefore reviews *de novo* the habitual residence finding.

"[T]his case turns on the determination of the child[]'s habitual residence, for the retention of a child in the state of its habitual residence is not wrongful under the Convention." *Barzilay v. Barzilay*, 600 F.3d 912, 917 (8th Cir. 2010). "It is the Convention's core premise that 'the interests of children. . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*,

589 U.S. 68, 72 (2020). Petitioner must show by a preponderance of the evidence that O.Y.K.'s habitual residence on July 25, 2025, was Israel. 22 U.S.C. § 9003(e).

In general, a child's habitual residence is "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291–92 (3d Cir. 2006) (citation omitted) (cited with approval in *Monasky*, 589 U.S. at 77, 78). "This approach considers a child's experience in and contacts with her surroundings, focusing on whether she developed a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places she encountered." *Id.* at 292 (citation modified) (citation omitted); *see also Monasky*, 589 U.S. at 77 (noting the Hague Convention's explanatory report referred to a child's habitual residence as "the family and social environment in which [the child's] life has developed" (alteration in original) (citation omitted)).

"For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." *Monasky*, 589 U.S. at 78. "Such facts include 'geography combined with the passage of an appreciable period of time,' 'age of the child,' 'immigration status of child and parent,' 'academic activities,' 'social engagements,' 'participation in sports programs and excursions,' 'meaningful connections with the people and places,' 'language proficiency,' and 'location of personal belongings.'" *Nisbet v. Bridger*, 124 F.4th 577, 584 (9th Cir. 2024) (quoting *Monasky*, 589 U.S. at 78 n.3). "Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations." *Monasky*, 589 U.S. at 78. "No single fact, however, is dispositive across all cases." *Id.* Courts determine a child's habitual residence by looking at "the totality of the

circumstances specific to [each] case," *id.* at 71, and they must be "sensitive to the unique circumstances of [each] case and informed by common sense," *id.* at 78.

**1. Parent's Intent**

At the time he came to the United States, O.Y.K. was approximately four and a half years old. On the date of retention, O.Y.K. had recently turned five—sufficiently young for the Court to consider the intentions of the caregiving parents as a factor. *See Nisbet*, 124 F.4th at 586 (explaining that the district court "followed the Supreme Court's teaching in *Monasky*" that the parents' intentions are "relevant considerations" for a child aged four and a half). But, mindful of *Monasky*'s instruction that no single factor is dispositive, the Court also considers several other factors as they relate to O.Y.K.'s acclimatization to the United States at five years old. After considering the totality of the circumstances, the Court finds that the preponderance of the evidence compels the conclusion that O.Y.K.'s habitual residence on the date of retention was the United States.

First, the record supports a finding that both parents intended to move to the United States in December 2024. The parties' behavior prior to traveling indicates a clear intention from both parties to permanently relocate. Before their December 6, 2024, flight, it is undisputed that the parties allowed their apartment lease in Israel to expire and neither renewed it nor leased another apartment. (Day 3 Tr. 24:10–12). While it is disputed whether Petitioner was involved in the sale of their belongings, at least some of the parties' furniture and appliances were listed for sale and were either sold or given away prior to their move. (Facebook Marketplace Messages, Resp't's Ex. A); (Day 2 Tr. 109:3–5; 124:1–2). Both of the parties' cars in Israel were sold prior to their move, as was their pet dog. (Day 1 Tr. 72:1–8); (Day 3 Tr. 33:18–34:20); (Day 2 Tr. 109:3–5; 146:12–23; 159:8–12); (Skoda Fabia Sale Proceeds, Resp't's Ex. CC); (Day 2 Tr. 146:12–23). The parties withdrew O.Y.K. from school

in Israel, and Respondent testified that he had a going-away party for his class. (Day 1 Tr. 155:21–23).

Multiple people testified that, prior to moving, both parties solicited advice and information about housing, schools, availability of kosher food, and professional opportunities in the United States. (Day 2 Tr. 49:13–50:7; 51:9–19; 104:20–15–2). In 2023, Respondent traveled to Las Vegas while Petitioner was still completing his school program. (Day 1 Tr. 131:16–25). While different witnesses characterized the purpose of the trip differently, both Respondent and Rachel Gil explained that Respondent visited to see how she liked Las Vegas as a place for the family to move to, and that Rachel Gil took her to see different neighborhoods during her visit. (Day 2 Tr. 50:17–51:19).

Before their December 2024 flight, Respondent's family held several going away parties. First, in June of 2024, Respondent's family had a farewell trip in Eilat, where the family rented a villa. (Day 2 Tr. 110:14–111:17). They also had a farewell party at their home a few days before the family's flight. (*Id.* 109:24–110:13).

Lastly, Petitioner finished his studies to become an electrician just before the move; the evidence supports a finding that the parties were intending to move for several years but were waiting until Petitioner finished his school to do so. (Day 2 Tr. 89:1–6; 109:12–19). Respondent closed her business in Israel by the end of 2024, also evidencing her intent to no longer live and do business in Israel. (Disqualified Business, Resp't's Ex. BB).

The parties' behavior once arriving in Las Vegas further supports the conclusion that both parents intended to relocate to, rather than visit, the United States. Shortly after arriving in Las Vegas, the parties signed a five-month lease on a house, (Lease, Resp't's Ex. R), paid the full five months' rent in advance, (Receipt, Resp't's Ex. S); and furnished the house, (Day 2 Tr. 61:4–16; 124:14–25:5). They very quickly purchased a car and insured it. (Title, Resp't's Ex. F); (Day 1 Tr. 45:15–46:11); (Temp. Placard, Pet'r's Ex. 34 (displaying issue date of December

9, 2024)); (Day 2 Tr. 148:8–14). Both parties obtained Nevada Instruction Permit Driver Authorization Cards and took their driver's license tests. (Pet'r's Driver's Permit, Resp't's Ex. H); (Resp't's Driver's Permit, Resp't's Ex. GG); (Day 3. Tr. 34:21–35:12). They also enrolled O.Y.K. in school soon after arriving, and they were offered a tuition grant for the 2024–2025 school year. (Certificate, Resp't's Ex. B); (Day 2 Tr 64:14–66:5; 148:21–25). Though Petitioner denied looking for work in the United States, Rachel Gil, Respondent's father, and Victor Haim all testified that Petitioner looked for employment. (Day 2 Tr. 64:22–65:13; 70:9–71:20; 104:14–105:6); (Day 3 Tr. 52:2–6). And Respondent organized a Nevada limited liability company, (Nevada Secretary of State, Resp't's Ex. P), obtained an Employer Identification Number, (IRS Letter, Resp't's Ex. W), opened a bank account, (Chase Summary, Resp't's Ex. X), all to establish a business as a hairdresser in the United States. (Day 2 Tr. 63:18–21).

Petitioner presented evidence of certain facts that could raise doubt about whether the parties' move was intended to be permanent: the parties had not gotten United States cell phone service, health insurance, or an established pediatrician for O.Y.K. as of February 2025. Petitioner also did not close his bank account in Israel. And Petitioner offered alternative explanations for, or claimed not to be involved in, some of the actions taken prior to leaving Israel and upon first arriving to the United States. But viewing all of the actions the parties took, including selling almost all of their belongings including their cars and their dog, not renewing their lease in Israel, prepaying a five-month lease on a house in Las Vegas, buying a car, and enrolling their child in school in Las Vegas, the Court concludes that the parties jointly intended to move to the United States indefinitely.

The conclusion that the parents intended to move to the United States indefinitely is not decisive because "[t]here are no categorical requirements for establishing a child's habitual

residence." *Monasky*, 589 U.S. at 80–81. The Court therefore considers this conclusion in the context of several other relevant factors to determine O.Y.K.'s habitual residence.

**2. Acclimatization**

Prior to moving to the United States, O.Y.K. had spent the first four and a half years of his life in Israel. When his parents decided to move to the United States, O.Y.K. was four years old. At the time of retention, O.Y.K. had recently turned five and had been in the United States for approximately seven months. Given O.Y.K.'s young age, the Court finds seven months to be a significant passage of time for him, particularly because he was at a particularly formative age.

Further, because O.Y.K. was not yet at an age where social engagement and other activities would play a large role in his life, family and school are likely the most important considerations for determining O.Y.K.'s personal acclimatization. As for school, O.Y.K. was first enrolled in preschool on January 15, 2025, at Desert Torah Academy, (Enrollment Contract, Resp't's Ex. D), then attended Kids R Kids, (Contract, Resp't's Ex. G). His mother testified that he has made friends through school, his neighborhood, and the synagogue. (Sheli Dep. Vol II 100:3–6).

As for his family, O.Y.K. has a large amount of family in Israel, who he previously saw very frequently when he lived in Israel. This fact is perhaps the strongest support for a finding that O.Y.K.'s habitual residence remained in Israel. The Court does discount the important role that family played in O.Y.K.'s daily life in Israel. It does note, however, that the parents made a decision to move O.Y.K. away from Israel. And in making that decision, the parents chose to move further away from the family O.Y.K. was connected to during the first four years of his life, and to move him closer to Respondent's cousin and her family in Las Vegas. Importantly, seven months into his time in the United States, O.Y.K. had likely formed "meaningful

connections" with his family in Las Vegas who he saw frequently, allowing him to grow acclimatized to his life in the United States. *Monasky*, 589 U.S. at 78 n.3.

### 3. Immigration Status

In Respondent's Objection to the R&R, she argues that the Magistrate Judge gave "disproportionate weight" to the parties' visitor-visa status. (Obj. 4:15–26). The Court agrees. Immigration status of the parent and child is one of the factors that may bear on the acquisition of a habitual residence. *Monasky*, 598 U.S. at 78 n.3. In general, courts have not treated a child's or parent's immigration status as a categorical disqualifier in habitual residence determinations. In *Mozes*, for example, the Ninth Circuit observed that "[w]hile an unlawful or precarious immigration status does not preclude one from becoming a habitual resident under the Convention, it prevents one from doing so rapidly." 239 F.3d at 1082 n. 45; *accord In re B. del C.S.B.*, 599 F.3d 999, 1010–11 (9th Cir. 2009) (unlawful immigration status does not preclude finding that child is a habitual resident" of a country within the meaning of Article 3).

Here, the family traveled to the United States on tourist visas that would allow them to stay in the United States legally for a maximum of six months. (JPTO 3:16–18). Respondent testified that the family intended to stay beyond those six months. (Day 1 Tr. 145:23–25). This testimony was disputed by Petitioner, who stated instead that the family intended to return on their original return flight in February. (*Id.* 32:25–33:20). But, as explained above, the family's actions taken as a whole evidence the family's intention to stay in the United States indefinitely. Regarding the family's immigration status, there is some testimony that the family met with an immigration attorney about adjusting their status after they arrived in the United States. (Day 3 Tr. 43:1–6). Moreover, there is evidence that Respondent applied for an adjustment of their immigration status in May 2025. (USCIS Notice, Resp't's Ex. L).

Magistrate Judge Couvillier's conclusion that O.Y.K.'s habitual residence relied heavily on his findings that (1) Respondent's intentions to overstay her visa are a "compelling factor

against Respondent," and (2) Respondent and O.Y.K. are "under an immediate and concrete threat of removal." (R&R 8:9–12; 10:2–3). First, the Court notes that the habitual residence finding is solely a question about "where a child is at home." *Monasky*, 589 U.S. at 77. In focusing on Respondent's intent to overstay her visa, and counting that intent as a "compelling factor against Respondent," the Magistrate Judge mistakenly focused his inquiry on the parent, rather than the child.

Next, Magistrate Judge Couvillier found that Respondent and O.Y.K.'s immigration status is "especially relevant" based on the current administration's current priority of immigration enforcement. (R&R 9:17–21). Focusing on the Ninth Circuit's holding that in cases "in which there is an immediate, concrete threat of removal . . . immigration status [can] constitute a significant factor with respect to the question whether a child is settled," *In re B. Del. C.S.B.* 559 F3d at 1012, the Magistrate Judge concluded that immigration was a significant factor here because Respondent and O.Y.K. are under an immediate and concrete threat of removal. First, it is not clear that language would apply in the context of a habitual residence finding. The discussion in *In re B. Del C.S.B.* was specifically about where a child is "settled" for the purposes of the delay defense, not about a habitual residence finding. In fact, the *In re B. Del. C.S.B.* court began its discussion of the "settled" inquiry by looking to the role of immigration status in the habitual residence context, explaining that the Ninth Circuit had previously held that "unlawful immigration status does not preclude a finding that a child is a 'habitual resident' of a country." 559 F.3d at 1010.

Even assuming the "immediate, concrete threat of removal" standard would apply in the context of a habitual residence inquiry, the Court concludes that there is no evidence to support a finding that Respondent and O.Y.K. face an immediate, concrete threat of removal. As the Ninth Circuit explained in *In re B. Del C.S.B.*,

> Although there are undoubtedly real risks posed by illegal status, the reality is that millions of undocumented immigrants are presently living in the United States, many of

> whom will remain here permanently without ever having any contact with immigration authorities. The "[Department of Homeland Security] estimates that the unauthorized immigrant population in the United States numbered 11.6 million in January 2008." Michael Hoeffer, et al., Office of Immigration Statistics, Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2008, 1 (2009), http:// www. dhs.gov/xlibrary/assets/statistics/% 25publications/ois_ill_pe_2008.pdf. The majority of these undocumented immigrants are long-term residents: sixty-three percent came to this country before the year 2000. *Id.* at 3. "Millions of immigrants, without regard to immigration status, have regular employment and established homes in the United States," and "[e]ven with occasional spikes in the enforcement of immigration laws, most unauthorized immigrants are unlikely to face removal." David B. Thronson, *Custody and Contradictions: Exploring Immigration Law as Federal Family Law in the Context of Child Custody,* 59 Hastings L.J. 453, 470–71 (2008).

559 F.3d at 1012. Although the statistics have undoubtedly changed in the last 15 years, the overarching point remains. The current administration's focus on immigration does not automatically mean that every person currently in the country illegally faces an immediate, concrete threat of removal. There is no evidence in the record that could support a finding that either Respondent or O.Y.K. are in removal proceedings or have final orders of removal that would render them immediately removable.

Reviewing *de novo* and applying this circuit's precedent, the Court finds that Respondent and O.Y.K.'s lack of legal status in the United States is a relevant consideration in that it may prolong the amount of time it would take for the United States to become O.Y.K.'s habitual residence. But, especially given the evidence that Respondent and O.Y.K. applied for an adjustment of status, the Court does not conclude that their immigration status strongly influenced where O.Y.K. was habitually resident on the date of retention.

**4. Totality of the Circumstances**

Weighing all the information discussed above, the Court finds that Petitioner has failed to prove by a preponderance of the evidence that O.Y.K. habitually resided in Israel on the date of retention. Perhaps most significantly for a child of O.Y.K.'s age, his parents made a decision to pick up their life in Israel and settle down indefinitely in the United States. His

personal belongings moved to the United States. After seven months in the United States at a formative age, attending school daily and spending time with his family in Las Vegas, the Court finds it likely that O.Y.K.'s presence in the United States was sufficiently settled to be deemed habitual.

No further analysis is required for the Court to conclude that Petitioner has failed to meet his burden of showing that O.Y.K. was wrongfully retained. Thus, the Court DENIES the Petition.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that the objection to the R&R, (ECF No. 68), is **SUSTAINED**, and the R&R, (ECF No. 35), is **REJECTED.**

**IT IS FURTHER ORDERED** that the Petition, (ECF No. 1), is **DENIED**. The Court emphasizes that this Order is not a determination on the merits of any custody issues within the meaning of the Hague Convention. Those issues are left to the appropriate court.

**IT IS FURTHER ORDERED** that Petitioner's request for attorneys' fees and costs are also **DENIED**.

**IT IS FURTHER ORDERED** that the United States Marshals Service is authorized to release the passport to Respondent Sheli Abergil or her counsel.

The Clerk of Court is kindly directed to enter judgment and close the case.

**DATED** this 17 day of July, 2026.

________________________________

Gloria M. Navarro, District Judge
United States District Court